Good morning. May it please the court, William Becker of Freedom X appearing on behalf of Appellant Plain of Santa Monica Nativity Scenes Committee. I'd like to reserve two minutes for rebuttal. We are asking the court to rule that when a city shuts down a forum in response to a bully, it must comply with constitutional norms. In a traditional public forum, the right of the government to limit expressive activity is sharply limited. Government can't hide behind a content neutral statute when its underlying purpose is to silence speech. We recognize that this is a somewhat unusual heckler's veto case and it may even be a case of first impression, but it can be logically extended or applied in this case because what you have, your honors, is expressive activity that for 60 years was operative under the city's policies and was shut down only because of the content. And I refer the court to... That's not entirely what the record says, counsel. Well, I'll refer the court to pages 233 and 234 of the record. And what is that? What are you looking for? I'm sorry, I've got an iPad here that I'm using. My finger's shaking. You're referring to the complaint? No, your honor, it's alleged in the complaint, but I'll summarize what it says. You're talking about the city staff's proposed areas, the 2003 memo? No, the city attorney stated very specifically at the hearing on June 12, 2012, that the only reason, the only reason that they were closing down the forum was because of the objections they received by a portion of the community. That's not what the record reflects. They had reports from city planners and from members of the city council that this process had become very contentious, that it was going to be time-consuming, that it was going to consume additional city resources. Your honor, the city's supplemental record at 0113, the only reason we made a suggestion to change it was it appears to have been unsatisfactory to a number of members of the community. That's what she said. But that doesn't say that it was based on the content. There's objections there. People have very complex reasons for doing things, and the fact that one city attorney said that people objected may not be the only reason for shutting down a forum. Well, no, your honor, except that the record is replete with evidence that they shut down the forum due to the controversy, specifically. Okay, but it was due to controversy. That's not necessarily due to content. The controversy arose from the hecklers' objections to the nativity scene. They weren't just hecklers. They were now participants in this exception that the city had made for the winter festival. That's a distinction without a difference, your honor, respectfully, because the hecklers' veto doctrine doesn't make that distinction. Now, this court could settle on that as some kind of exception to the hecklers' veto doctrine, but I would argue that it shouldn't be an exception to the hecklers' veto doctrine because you have very specifically an individual and a group of individuals who are attempting to stop a particular manner of expressive activity. They're doing it for that purpose, and when the city then decides that it doesn't want to deal with the controversy, specifically says that over and over again, then they're responding to the hecklers' objections. Counselor, typically in a hecklers' veto case, what happens is that a particular speaker is silenced and everybody else is allowed to speak, and the speaker is silenced because of controversy, because of opposition, because of whatever. That's not your situation here. The city has decided to withdraw this limited exception to its no unattended displays in a neutral basis. So where's the hecklers' veto? They've also shut down Mr. Dix. Your honor, under that logic, and I'll just use by analogy, if we were to consider in the early case, the city in that case shutting down a parade simply because... They wouldn't be shutting down a parade. They would be shutting down all parades. And that's what would be illogical and imprudent for the city to do under those circumstances. Under the circumstances here, it's imprudent to shut down an entire forum to everybody simply because some particular component of that forum intentionally, deliberately is attempting to shut it down. That's his goal and motivation. Was the city obligated to open the forum in the first place? Of course not. If it's not obligated to open it in the first place, why can't it shut it down? Because it has to apply the particular standard required where a content-based restriction has been applied. And so in this case... Well, they didn't shut it down just with respect to Christians who wanted to put up Nativity scenes. They shut it down with respect to everybody. They shut it down with respect to the controversy. If you look at the Chabad case, which has been briefed, but not for this particular principle, that's at 363 F 3rd 427. That's a Sixth Circuit case. In that case, a Jewish organization wanted to erect a large menorah display on the main public square in Cincinnati and argued that a city ordinance prohibiting any non-government permit-based use of the square during the holiday season violated their First Amendment right to free speech. The city wanted to control the square under an exclusive use policy for the specific purpose of shutting out controversial and unpopular speech. And this is what the court said. Although the city's ordinance appears content-neutral on its face, prohibiting all private speech that normally requires a permit, the district court concluded that it was de facto content-based because the city's purpose in passing the ordinance was to prohibit controversial and unpopular speech from being expressed in a traditional public forum during the holiday season. So, Your Honor, we have the same here. We have a de facto content-based restriction where the record adequately, plausibly alleges facts that a judge could reasonably infer a heckler's veto existed. Now, I said at the beginning of this address, Your Honor, that we're asking for a rule that may be an extension of the heckler's veto policy. In my judgment, looking at the facts of this case, it is different from the typical heckler's veto case. Is it different from the Knights of Columbus case from the First Circuit? I believe so, Your Honor. For several substantial reasons. First of all, that was a judgment ruled, appealed from a summary judgment, not from a 12B6, but a Rule 56. Additionally, though, the court in that case adopted what was an animus standard. It looked to the actual specific intent of the city fathers. And that's not the standard in the Ninth Circuit. The Ninth Circuit under City of Las Vegas v. Foley is an objective standard where the court is required to look at certain objective factors. One of those factors is what the effect of the regulation is. And in this case, the city stated on the record that the ordinance, the amendment to the ordinance would effectively, using the cognate of the word effect, would effectively shut down all private unattended displays, including, and it specified, religious displays, and more specifically, the nativity scenes. It understood what the effect was going to be. That's only one factor, of course, that the court has to consider under Foley. Now, if a group wanted to put on a live nativity scene, sort of a moving nativity scene or a flash mob nativity scene in Santa Monica Park, that would still be permissible, wouldn't it? Because that would not be unattended. That's exactly right. The message of the Christmas season can still be exhibited in different manners. And so what they've done here is they've chosen to exclude a particular manner of speech. Unattended. Unattended, right. But, Your Honor, they could have narrowly drawn the statute. They didn't have to totally ban everything, especially under a strict scrutiny standard. What they could have done was, under a case called, a Supreme Court case called Thomas v. Chicago, Chicago's Park District. Let me see if I have the site for that. Yeah, that's 534 U.S. 316. It's a 2002 case. What they could have done was adopt restrictions or guidelines that said that permits would be denied if they were not fully complete or executed. If they contain a material falsehood or misrepresentation or where on prior occasions the applicant made material misrepresentations regarding the nature and scope of an event or activity previously permitted or the applicant has violated the terms of prior permits issued. So those restrictions or those guidelines could have been adopted in this case. And I would argue or contend that they would have foreclosed any of the problems or any of the rationales that the city has. So the nativity scenes, the unattended nativity displays had been historically in the park for like, what, 50, 60 years? Six decades. And the city council, as I understood it, was concerned that they couldn't say we will allow only these Christian nativity scenes here. I mean, maybe they were right or maybe they were wrong. But is it your view that they would have been entitled to say no one can display unattended scenes here other than these Christian groups that historically have done it for the past 60 years? No, Your Honor. What we're saying is that when the city opens a forum to a particular type of expressive speech, then it can't shut it down based on context. So they could have said, I mean, as they did, they said, look, we can't hold it open only for these Christian speakers. We have to allow others to compete for these spaces. That was the policy. And they thought they were legally required to do that and they did it. And then it was the result of opening the forum to other speakers that caused them a big headache and they didn't like the chain link fences or whatever the atheist groups were displaying. So at that point, why are they ratifying hostility towards the Christian speech? At that point, after the competition itself has become a big headache, why couldn't they shut it down? That doesn't seem to be ratifying hostility. Well, it is because that's the secondary effect of what the heckler is up to. The heckler attempted to shut down the forward by making it so unpalatable for the city to continue the tradition. And that's the nexus in the case. But if they were complying with legal requirements by opening the forum to all comers, are you saying they're required to continue to have their 200 applicant lottery regardless because otherwise that would raise a concern? I'm not understanding that. Let me be clear then, Your Honor. In the year 2011, they went to a lottery. The lottery selected 18 spaces for the hecklers and two spaces, one for the menorah, one for the nativity scene. So they were limited in that lottery. But the 18 spaces that were awarded were based on misrepresentations in the application. Nine of them were left empty. That was a misrepresentation, a material one that they made. And under the Thomas rule, they could exclude them in the future to bar that kind of gamesmanship. And the other nine misrepresented what they were going to do as well. They said we're going to put up a holiday display, we're going to put up winter solstice. What they ended up doing was putting up political speech and anti-religious speech. That's a material misrepresentation. Now what we want is to see that forum open to all. We would have liked to have a traditional winter display type of thing. But the fact is that, just as Brandeis said, the answer to objectionable speech is more speech, not enforced silence. And so that's what we're looking to have this court adopt as well. You're down to a minute and a half, so we'll let you restart your time. Okay, thank you. Good morning, Your Honor. May it please the court, Ibn Shen for the City of Santa Monica, the defendant, Apelli in this case. I'm joined at the council table by my colleague, Barry Rosenbaum. The district court correctly granted the city's motion to dismiss. And this could not be better amplified by the plaintiff's concession in front of the district court and in the reply brief in front of this court, which is that governmental authorities have the right to prohibit private unattended displays. With that fatal concession, very little remains of this litigation and very little should remain of this appeal. They can't prevent it for unconstitutional reasons. You agree with that, right? Yes, Your Honor. And in this case, the city council did not do so for unconstitutional reasons. The record is replete with the administrative reasons why the city council chose to end this narrow exception for unattended displays. Well, there's no doubt that the additional applications by the atheist groups were done not because they wanted to speak, but because they wanted to silence the Christian speech. Isn't that correct? That seems to be the unmistakable implication from the record. Your Honor, the law is pretty clear in terms of governing the government's ability to regulate. Well, is that true, then? That it was pretty clear and the city council acknowledged, and everyone seemed to acknowledge it, that the reason that the speakers, the FICs and their cohorts were trying to get applications was to get rid of the Christian speech. While there may be suppositions from the community as to what the intent of the speakers are, the law is pretty clear that... Don't you think that's the clear implication? Can you answer my question? Your Honor, I cannot second guess what the council's reading of the facts were in front of them, but what I can say is that the council looked at the totality of the record in front of them, which included the administrative burden, the hours spent, and the impact. The court could have inferred that that's the clear implication, that the intent is unmistakable here based on the statements that were made by the applicants and those groups. Your Honor, the record in front of this court shows that there were competing speeches, and respectfully, I believe that's the best... So you don't think anyone could infer an intent on the part of the atheists? It's hard to say what inference can or couldn't be made, but I... They left nine of these spaces open without any displays there at all, so that's not speech, is it? That's just silence. Well, Your Honor, I believe... They kind of silenced those particular nine spaces, correct? Your Honor, I believe the lack of speech could be a basis for speech itself. Excuse me. If I have any further disturbances, I'm going to excuse those who are disrupting the court, okay? I won't warn again. I'll ask the marshal to take you out. Go ahead, counsel. And, Your Honor, if I may point the court to the record that has developed since the adoption of Ordinance 2401, it becomes very clear that the city council's ordinance was not intended to shut out any particular speech, especially not speech by the plaintiffs. If we look at the record that's submitted to this court as part of a request for judicial notice by the city, in 2012, 2013, and 2014, there were substantial opportunities to communicate any group's message. And notably, in 2013, the plaintiffs themselves were able to erect a 24-foot-long display containing pictorial representation of the nativity scenes. In addition to that, as part of the... That was on private property? It was in Palisades Park, Your Honor. That was part of the plaintiff's opening ceremony for their display program. The majority of their actual displays, which were very large and significant, 6 feet by 18 feet by 8 feet, were erected on private property. But one 24-foot-long banner display was erected in Palisades Park. Was Palisades Park controlled by the city of Santa Monica? Yes, Your Honor. Palisades Park was the original destination for all 14 displays. And subsequent to the adoption of the council's ordinance that ended the exception, the plaintiffs were able to communicate their views by having their opening ceremony, engaging in caroling, Christmas storytelling, and erection of this display. And while the display was unattended, is that the reason they could do it? That's right, Your Honor. This display was attended, and the plaintiffs did so both in 2013, the holiday season of 2013, and the holiday season of 2014. And going back to 2012, there were three separate groups that engaged in expressive activities in the city's Palisades Park. There were two religious organizations that enacted live nativity scene events. Well, that only goes to whether it was a valid time, place, or manner requirement, right? Not whether it was content-based restriction. Yes, Your Honor. So your argument goes to, this was a valid time, place, manner restriction because there were ample alternative channels of communication. Yes, Your Honor. So can you address why it's not content-based? Yes, Your Honor. Because that's the gist of their argument, as I understand, is that the reason that the opponents started to submit all of these applications was to silence the 60-year history of Christian speech in the park. And the city council, by ultimately banning all unattended displays, was responding to that type of activity, content-based activity, thereby ratifying it. That's what I understand the argument to be. Yes, Your Honor. However, that argument is belied by both the law and the facts. I'll start with the law. As the district court correctly observed, as this court has consistently held, in assessing whether restraint on speech is content-based, and I'm citing the Menotti v. City of Seattle case, courts do not engage in a searching inquiry for hidden motives. The courts look to literal commands of the restraint. If we look at the literal commands of the restraint that was contained in Ordinance 2401, the ordinance could not be more clear. So it's neutral on its face, but it's also perfectly clear that the people applying for these additional spaces and causing the headaches were motivated by content. In other words, it wasn't just they had an objection to unattended displays in the park because of aesthetic or environmental concerns. They were motivated by content, and they didn't hide their motivation, as I understand it. Your Honor, there are a number of responses to that. First of all, both the United States Supreme Court and this court has rejected repeatedly the arguments made similarly by this plaintiff, which is that a statute that's viewpoint-based simply because its enactment was motivated by conduct of partisans on one side does not support a finding of a content-based legislation. In both the Hill v. Colorado case, which was a United States Supreme Court case, which essentially upheld buffer zones outside of health care clinics, though the particulars of that case was abortion clinics, and also in the Velasque v. Superior Court of California case, which this court upheld the City of Los Angeles ordinance that prohibited certain size thickness of wooden sticks in demonstrations. In Hill, the ordinance had words to the effect of you can't approach people with an AP for education and counseling, and the court held that that wasn't content. They said that was categories of speech, not content. But here, the speech is clearly content, right? It's Christian speech. So I don't think you would say, well, that's not content-based. Your Honor, in fact, I think in this case, this counsel went a step lesser than the Hill case because the ban was comprehensive. The counsel did not single out categories of speech, say secular speech or Christian speech. The counsel prohibited all displays while allowing all unattended displays while allowing the type of speech that the plaintiff seeks to continue by having, whether it's leafleting or attended displays, the various myriad of opportunities that are demonstrated by the record. In addition to the commands of these court decisions, another issue is telling, which is that the plaintiff advances this, in the plaintiff's words, this exception to the heckler's veto theory. But I think this is probably just conflating this court's differentiation between manner of speech and content of speech. And I think that conflating is telling. In the Center for Bioethical Reform case, which is primarily relied upon by the plaintiffs, the majority opinion concluded that a statute that restricts speech only when it is disruptive because of its manner, not because of its content, is an example of a content-neutral regulation that's been affirmed time and again. In this case, the counsel acted because of the manner of the speakers in Palisades Park, not because of their content. They didn't have any problem with the manner for 60 years, right? So it wasn't until the atheist groups started attacking it that they found a problem. They had been there, right, doing these unattended displays for decades? Yes, Your Honor, the displays had been there for many decades. However, by 2009, 2010, 2011, the record was clear that the administrative burden on the city had increased. And that was because of the hecklers, right? Well, Your Honor, I think there were increased numbers of applications and there were competing speakers. Now, in the Knights of Columbus case, the city council was faced with precisely the same dilemma where they operated in allowance of one creche for many, many decades, but they were faced, just like the city of Santa Monica, with increased applications and increased displays. As the court correctly noted in that case, it was competing speech, and the counsel was at a precipice and needed to make a decision. They could allow the competing speech or they could conclude that the burdens of that competing speech was too much for the public forum that they were attempting to protect. And that case was the landmark Battle Greens, and in this case, it's the landmark Palisades Park. And the city council rationally decided, based on the record before it, the 254 hours that the staff had to spend in managing the display program, the view obstructions, the damage to the grass, which was all in front of the district court and now in front of this court, was sufficient. And now, in terms of hours alone, the record is telling. 245 hours was what was spent by city staff in 2011. Counsel, let me shift the inquiry just a little bit. Let's suppose that instead of this being a lawsuit by the Santa Monica Nativity Scenes Committee, that this was a lawsuit by Mr. Vicks, complaining that the minute that he becomes successful in obtaining permits on an equal basis to put up displays during the holiday season, that the whole enterprise gets shut down. In other words, the city, from his perspective, he might say, this looked like this was on an equal basis as long as Christian nativity scenes were put up. The minute somebody else gets in there, then they shut the whole enterprise down. Does Mr. Vicks have a stronger argument based on Heckler's veto? Well, Your Honor, it's the city's position that none of the speakers would have a better argument than any other. However, the record, it is interesting that Your Honor points to... What would be a little bit different is that his would be probably a minority view, and a very unpopular view. And as soon as somebody who's unpopular gets access to the soapbox, so to speak, then we decide to take the soapbox away. It's certainly the case that that would be closer, though not on point with respect to Heckler's veto cases. And Your Honor correctly points out that the record is replete with evidence where the city council, the city staff, and even the community, through the three public hearings, were searching for ways, were trying to find ways to keep the display program. The city attorney's staff report, in one instance, was telling, in her staff report, and I quote, that she indicated there were vast public support for the Nativity Scenes program. However, she correctly cautioned the council against engaging in a content-based selection to only keep the Nativity Scenes program. So Your Honor correctly points out that the record in front of the Nativity Scenes, it is perhaps a tougher road for this plaintiff to travel because for 60 years, there's a record of accommodation, and even at the precipice, when the council was forced to make a choice, and again, much like the council's choice in the Knights of Columbus case, there was everything in the record to show that the council wanted to keep this program if it was able to do so constitutionally. And I wanted to go back to the plaintiff's allegation that this program entirely shuts out the plaintiff's opportunity to erect displays. One of the arguments advanced by the plaintiff was that it would be incredibly costly for the plaintiff to erect these displays or to continue to do so in light of Ordinance 2401. It is true that these displays are very large, but Ordinance 2401 does not prohibit the plaintiff from erecting precisely the same 14 displays in precisely the same location every single day during the holiday as long as there are... But as a practical matter, they can't do that. So that seems a little disingenuous. I mean, they can't speak the way they had for the past 60 years. They've said, and there's no reason to doubt it, they can't take them down every night and put them back up every morning. So that doesn't seem like quite a fair characterization of the record. Indeed, Your Honor. However, the United States Supreme Court has clearly indicated that the government need not remove obstacles not of its own creation. And indeed, both this court and the United States Supreme Court has consistently held that cost is not sufficient to authorize speech that's otherwise disruptive. In fact, in the Vincent case, which is a signed case on public property, the United States Supreme Court noted that while it's cheap to put up signs and not attend them, there are significant public impacts and the local government is free to regulate and address that public impact. It may be that the plaintiffs would have to hold those signs. That's incredibly analogous. And similarly, in the Kovacs case, Kovacs v. Cooper, another United States Supreme Court case where the court was faced with the issue of sound trucks blaring through the municipal streets, the plaintiffs advanced the argument that it is certainly cheap to have a sound truck blaring through the city, but the government had significant, indeed substantial, governmental interest and that cannot be outweighed just by the cheapness that would be intended upon the plaintiffs. You've used all of your time and more. Thank you, Your Honor. Thank you, Your Honor. Mr. Becker? Thank you, Your Honor. The city's analysis begins at the tail end of the donkey. It begins with whether there are ample channels of communicating the message and that's not where the analysis begins. In a content-based strict scrutiny analysis, it begins with whether or not, well, first, whether it's a content-based statute and, secondly, whether the city has a compelling governmental interest. The city has never even tried to argue it has a compelling governmental interest in this case. So if the court believes that it was a content-based restriction, it's going to find that the record has no evidence of a compelling governmental reason. It also will find that it didn't narrowly tailor the statute, as I mentioned before, and if even a single... Well, it's content-neutral unless it's a heckler's veto. I mean, you don't argue the statute faces content bias. No, it's a facially neutral ordinance, Your Honor, but from which the underlying facts can fully, one can objectively infer, the underlying purpose of it was content-based. Now, the evidence in a district court... Well, the nexus that we've described... I mean, all the evidence, to the extent there is evidence, is that they actually would have preferred to keep it, but it was the administrative burden that led to this decision. There's no real objective evidence they would have preferred, despite what the subjective statements at the city council hearings were, Your Honor. The objective factors are that they were responding to the controversy. The controversy was what Damon Vicks was up to in gaming the process. Now, the council for the city mentioned the Menotti case. Menotti also said that a restriction on expressive activity is content-neutral if it is justified that is based on a non-pretextual reason divorced from the content of the message attempted to be conveyed. Everything here has been pretext that we've seen. Also, the city mentioned the fact that in Menotti, if you're going to look at the third prong of the analysis, and you're going to say, well, the city's been able, or the committee's been able to put on its different kinds of displays which don't have the same impact, don't have the same effect, don't have the same traditional value to the community, in some different manner, then I would cite you both to the case that the council mentioned, Hill v. Colorado, where the Supreme Court said, Our foundational First Amendment cases are based on the recognition that citizens subject to rare exceptions must be able to discuss issues, great or small, through the means of expression they deem best suited to their purpose. It is for the speaker, not the government, to choose the best means of expressing a message. Counselor, you're well over your time. You may want to wrap up. Okay. I just want to respond to Judge Malloy's earlier question about town of Lexington. The main distinction between that case and ours is that the court never considered a heckler's veto theory at all, and it wasn't presented in that case. Thank you, Your Honor. Thank you. Thank both counsel for the argument.
judges: Melloy, Bybee, Ikuta